## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re:<br><br>YELLOW CORPORATION, *et al.*,<br><br>    Debtors. | Chapter 11<br><br>Case No. 23-11069 (CTG)<br><br>(Jointly Administered)<br><br>**Related Docket Nos. 3728, 4290** |
| JEFF MOORE, ELIZABETH BROOKE MOORE, and VIDAL TORRES, on behalf of themselves and all others similarly situated,<br><br>    Plaintiffs,<br><br>    v.<br><br>YELLOW CORPORATION, *et al.*,<br><br>    Defendants. | Adv. Proc. No. 23-50457 (CTG)<br><br>**Related Docket Nos. 98, 100** |
| WILLIAM G. COUGHLEN, individually and on behalf of all others similarly situated,<br><br>    Plaintiffs,<br><br>    v.<br><br>YELLOW CORPORATION, *et al.*,<br><br>    Defendants. | Adv. Proc. No. 23-50761 (CTG)<br><br>**Related Docket Nos. 49, 65** |

## <u>MEMORANDUM OPINION</u>

## TABLE OF CONTENTS

Factual and Procedural Background ..................................................7

Jurisdiction ................................................................................17

Analysis .....................................................................................18

I.  Though the faltering company and unforeseeable business
    circumstance exceptions are available on the merits, the
    claimants are entitled to summary judgment because the debtors
    failed to provide a sufficiently detailed form of notice...................18

    A.  The statutory exceptions apply as a substantive matter. ........19

        1.  The debtors substantively qualify for the faltering
            company exception ..........................................................19

        2.  The debtors substantively qualify for the
            unforeseeable business circumstances exception...........................24

    B.  As a procedural matter, the debtors cannot avail themselves
        of either statutory exception because their notices were
        deficient. .................................................................29

        1.  The formal WARN Act notices were insufficient ...........................30

            a.  The non-union notices were insufficient ..................................30

            b.  The union notices were also insufficient..................................31

        2.  Neither the debtors' other communications to its
            employees nor the fact that Yellow's demise was widely
            publicized excuses the debtors' failure to send
            compliant WARN Act notices...........................................38

i

II. The liquidating fiduciary exception does not apply to the layoffs of the non-union employees; the existing record does not permit the entry of summary judgment for either party on the application of the liquidating fiduciary exception to the union employees........................................................................................................42

III.Whether the non-union WARN claims were properly released cannot be decided on the current record ..........................................................49

   A. The first six factors, collectively, counsel in favor of enforcing the releases...................................................................................................50

   B. There is a genuine question of fact as to whether the debtors paid consideration in exchange for the release of claims .........................54

IV.There is a genuine question of material fact as to whether damages should be reduced on account of the debtors' good faith .................59

V. The Court will grant summary judgment in part, and deny it in part, with respect to the various state law claims ..........................................62

Conclusion ...............................................................................................................67

The federal Worker Adjustment Retraining Notification Act and similar state statutes generally require employers to provide employees with advance notice of a plant closing or a mass layoff.[1]  In the case of the federal statute, 60 days' notice is required.  The failure to provide such notice entitles the employees to recover backpay.[2]  The debtors in these bankruptcy cases, Yellow Corporation and its various affiliates, were once among the nation's largest trucking companies.[3]  Their business collapsed in July 2023, leading to the termination of about 3,500 non-union employees on July 28, 2023 and about 22,000 union employees on July 30, 2023.  This bankruptcy case was filed a week later, on August 6, 2023.

The debtors did not provide their employees with 60-days' notice of the layoffs. As a result, those employees have asserted claims in these bankruptcy cases seeking to recover the backpay to which they claim to be entitled under the WARN Act and similar state laws.  The debtors have asserted various defenses to those claims.  Upon the completion of discovery, the parties filed cross-motions for partial summary judgment.[4]

---

[1] The federal statute is codified at 29 U.S.C. § 2101, *et seq.*, and is referred to as the "WARN Act."

[2] *See generally United Food and Commercial Workers Union Local 751 v. Brown Group, Inc.*, 517 U.S. 544 (1996).

[3] Debtors, Yellow Corporation and its affiliates are referred to, collectively, as "debtors" or "Yellow."

[4] In late April 2024, this Court issued scheduling orders providing that approximately 1,300 proofs of claim filed in the main bankruptcy case seeking damages for violations of the WARN Act, and the *Moore* and *Coughlen* adversary proceedings, shall all proceed in parallel.  *See In re Yellow Corp.*, Bankr. D. Del. No. 23-11069 (the "Main Case") D.I. 3186; *Moore v. Yellow Corp.*, Bankr. D. Del. Adv. Proc. No. 23-50457 (the "*Moore* Adversary") D.I. 56; *Coughlen v. Yellow Corp.*, Bankr. D. Del. Adv. Proc. No. 23-50761 (the "*Coughlen* Adversary") D.I. 22.

For the reasons described below, the motions will be granted in part and denied in part.  Specifically:

1.    The WARN Act contains statutory exceptions for circumstances in which (a) at the time notice would have been required, the company is actively seeking new capital or business, and it reasonably believes that sending a WARN notice would tank those efforts (this is the so-called "faltering company" exception) and (b) the layoffs are caused by "unanticipated business circumstances."  Where either of those exceptions applies, the 60-day notice period may be shortened.  But even then, the company is still required to provide a notice.  The notice must contain a brief statement explaining why one or more of the exceptions applies.  The summary judgment record here shows that both of the exceptions were in fact applicable.  The form of notice the company sent, however, failed to comply with the statutory requirements.

As to the substantive applicability of the faltering company exception, the record is clear that in May 2023, when the 60-day notices would have otherwise been required, the debtors were in discussions with various parties seeking to refinance existing debt and to free up additional collateral that would have supported further borrowing.  Those efforts were ongoing up and until the time that the business ultimately collapsed in late July 2023.  The employees' various arguments as to why

---

This Memorandum Opinion addresses summary judgment motions filed both in the contested matters arising out of the debtors' objections to the proofs of claim and in the adversary proceedings.  The plaintiffs in the adversaries and the creditors who have asserted WARN Act claims are referred to interchangeably as the "plaintiffs" or "claimants."

the company's efforts to raise capital do qualify under the faltering company defense are unpersuasive.

The record also shows that, substantively, the unforeseeable business circumstances defense is applicable.  There is no way to sugar coat the record.  The company failed to make a payment to its pension funds in July 2023.  That entitled the union to announce that it was striking.  In a game of chicken that went terribly wrong, the Teamsters responded to that missed payment by issuing a notice that they intended to strike in 72 hours.

That strike notice was intended as a bluff.  Sean O'Brien, the Teamsters' president, testified at his deposition that he expected that, in fact, the parties would meet at the bargaining table after the threat notice was issued, that the parties would reach an agreement that averted the strike, and that the debtors' business would continue uninterrupted.

Things did not work out that way.  In fact, the well-publicized strike notice led the debtors' customers to send their business elsewhere.  Within days, all hope of saving the company had been lost.  The debtors came into bankruptcy on August 6, 2023, seeking to conduct an orderly liquidation of their assets.  Against this backdrop, there can be little question that the business circumstances that caused the layoffs were "unanticipated" within the meaning of the WARN Act's exception.

That said, even when an employer has a valid defense on the merits, the statute still requires the employer to send a notice that provides employees with a brief statement of the basis for reducing the notice period.  The law is clear that this

statement must be factual rather than conclusory.  As described in further detail below, the notices that the debtors sent were inadequate.  The debtors emphasize that much of the information that should have been included in the notices was communicated separately to the employees and indeed was so widely publicized that it was well known to everyone and anyone.  While there is some truth to that, and it is certainly relevant to the issue of "good faith" addressed below, it does not fully excuse the failure to send a compliant notice as the statute requires.

2.      The WARN Act contains another exception, though this one is implicit rather than express.  The Act only applies to "employers" as defined under the statute.  To be an employer, the company must be (among other things) a "business enterprise."  Regulatory guidance and controlling caselaw make clear that when a company stops conducting business and is merely in the act of liquidating its assets for the benefit of creditors, it is no longer a "business enterprise" and thus not an "employer" covered by the statute but is instead a "liquidating fiduciary."

As the Court reads this caselaw, the debtors became a liquidating fiduciary after they completed delivery of their last shipment.  The record reveals that this occurred on July 30, 2023.  That means that the debtors were an employer, not a liquidating fiduciary, when they laid off 3,500 non-union employees on July 28, 2023.  The record does not reveal, however, whether the debtors' last shipment was delivered before or after they laid off 22,000 union employees on July 30.  Because this question of material fact cannot be resolved from the existing summary judgment record, partial summary judgment will be denied with respect to those layoffs.

3.     The vast majority of the non-union employees ended up signing documents under which they released their WARN Act claims in exchange for a severance payment.  In normal circumstances, that would be the beginning and end of the matter, as such releases are typically valid and enforceable in the absence of unusual circumstances.  The circumstances here, however, present a complication.

The record suggests that the debtors made a decision, as their bankruptcy filing was approaching, to go ahead and make severance payments to all of their employees regardless of whether the employee had in fact executed a release.  To the plaintiffs in the *Moore* adversary, that means that the debtors were lying when they told their employees that they needed to execute the release in order to get the severance payment.  And therefore, the *Moore* plaintiffs argue, the releases that those employees signed were procured by fraud.  And because the employees were going to get the severance payment whether or not they executed the release, the release is unenforceable because it is not supported by consideration.

This argument strikes the Court as far-fetched.  But in connection with its resolution of this summary judgment motion, the Court is bound by the Rules of Civil Procedure not to make findings of credibility and to draw all reasonable inferences in favor of the party opposing summary judgment.  And in fairness, the summary judgment record is rather thin on the question of how and why the debtors ultimately decided to make the severance payments to all of its employees.  The Court accordingly concludes that this matter cannot be resolved on the existing summary judgment record, but instead can only be decided after trial.

4.    Section 2104(a)(4) of title 29 provides that if an employer that has violated the WARN Act "proves to the satisfaction of the court that the act or omission that violated this chapter was in good faith and that the employer had reasonable grounds for believing that the act or omission was not a violation of this chapter," the court may "in its discretion, reduce the amount of the liability or penalty provided for in this section."

The Court is sympathetic to the argument that this "good faith" basis for reducing the statutory damages should apply.  As described above, as a substantive matter both of the statutory exceptions to the WARN Act were in fact applicable here. The violations arise out of the fact that the notices the debtors provided were worded improperly.  And much of the information that those notices should have contained had been separately communicated by Yellow to its employees and was widely publicized at the time.  For those reasons, this seems like an awfully strong case for reducing the damages on the ground that the violation was a purely technical one and that the company had in fact acted in good faith.  That said, because the statute calls on the Court to make a discretionary judgment based on the full set of facts and circumstances, the Court does not believe it appropriate to render decision on this issue based on the present summary judgment record.  The Court will be prepared, however, to address this issue after trial.

5.    Finally, certain of the claimants also assert claims arising under state law counterparts to the WARN Act or state wage and hour laws.  The resolution of each of those state-law issues is set forth in greater detail in Part V of this

Memorandum Opinion.  In broad strokes, those state laws generally follow the federal WARN Act, though there are a handful of individual quirks of state law that lead to different results in particular cases.  For the reasons set forth in greater detail below, summary judgment on the state-law claims will be granted in part and denied in part.

## Factual and Procedural Background

The debtors operated one of the country's largest less-than-truckload transportation companies with facilities in all fifty-states.  They employed about 30,000 people and, in their final months of operation, typically picked up approximately 50,000 shipments per day.[5]  The debtors had, over the years, acquired a number of different trucking brands.  They attributed much of their financial distress to the failure to integrate these separate brands.  To address this issue, the debtors sought to streamline their operations through an effort they described as the "One Yellow" initiative.[6]  Yellow's employees were largely represented by the Teamsters Union, whose cooperation was necessary to the implementation of One Yellow.

The debtors planned to execute One Yellow in three phases.[7]  In 2022, Yellow, with "Union support and Union approval," successfully implemented what Yellow described as Phase 1, which consolidated and streamlined Yellow's freight operations in the Western United States, accounting for approximately 20 percent of its

---

[5] D.I. 2581 at 3; D.I. 3729-1 at 93-94 of 139.  Unless specifically identified as having been filed in the *Moore* Adversary or the *Coughlen* Adversary, citations to items on the Court's docket are to the docket in the Main Case.

[6] D.I. 2581 at 6-9.

[7] *Id.* at 9.

network.[8]  Phase 2 would consolidate Yellow's operations in the "East, Central, and portions of the Southern regions–covering 70%" of its network.[9]  This phase would consolidate both Yellow's freight operations and its dispatch and terminal operations.[10]

As part of these changes, union drivers would be required to work with cargo on docks for three hours of their nine-hour shift.[11]  The union contended that this was inconsistent with the National Master Freight Agreement.[12]  To the extent it was, the change would require reopening negotiations of the National Master Freight Agreement, which was not set to expire until 2024.[13]  The union was therefore under no legal obligation to consider the company's requests before then.[14]

The company nevertheless pressed the Teamsters to engage in discussions designed to permit the debtors to implement Phase 2 of One Yellow.[15]  On May 5, 2023, the debtors told the Teamsters Bargaining Committee that Yellow could not wait until August to renegotiate the agreement, since the savings associated with the implementation of Phase 2 were necessary to ensure the company had sufficient

---

[8] *Id.* at 9-10.

[9] *Id.* at 11.

[10] *Id.*

[11] D.I. 3794-1, Ex. 7 (Ho Declaration).

[12] D.I. 3794-3 at 2.

[13] *Id.*

[14] D.I. 3729-2 at 2.

[15] D.I. 2581-13.

liquidity to continue as a going concern.[16]  On May 25, the Teamsters proposed an immediate $1.50 per hour wage increase in return for their supporting the work rule changes. [17]

The debtors counteroffered on May 30 requesting implementation of Phase 2 and the reopening of negotiations of the National Master Freight Agreement.[18]  The debtors' proposal was additionally dependent on refinancing their existing debt.  The Teamsters rejected the offer on June 5.[19]

The dispute between the company and the unions then became more public.  On June 8, the company asked its employees to "contact your local union to get everyone back to the [negotiating] table."[20]  In that email, after providing an overview of the One Yellow initiative, negotiations with the Teamsters Union, and the stance of the Teamsters president, the letter stated that the Teamsters' "militant" position was "risking the livelihoods of all Yellow employees."[21]  On June 13, the debtors sent another letter to employees, telling them that the Teamsters Union needs to "knock this off" and asked for the union to return to the negotiating table after the company's latest offer was rejected.  "[Teamsters President] Sean

---

[16] D.I. 2778-1 at 236 of 259.

[17] D.I. 2581-15.

[18] D.I. 2778-1, Ex. 11.

[19] D.I. 2581-16.

[20] D.I. 2581-18.

[21] *Id.*

O'Brien's baseless attacks are irresponsible when we have the jobs, lives and families of so many Teamsters and other employees on the line."[22]

On June 14 and 15, in the face of what they described as a "deterioration in business conditions," a liquidity crunch, and an urgent need to "conserve cash," the debtors requested a two-month deferral of their contribution to the Central States pension fund.[23]  Central States ultimately declined the debtors' request.  On June 21, the debtors sent another email to all employees notifying them of this development. They stated that the company "has recently been operating at a loss" and is "working with its lenders to provide financial support in the near term until a broader refinancing is possible."[24]  On June 23, Yellow's board authorized a lawsuit against the Teamsters to require them to resume negotiations.[25]

The debtors expressed serious concern that their deteriorating financial condition would lead to a breach of certain covenants in their loan agreements as early as June 2023.[26]  In fact, the debtors had retained Ducera as their investment banker, as early as January 2023, to address their ongoing need for financing.[27]  On May 26, Ducera made a proposal to the debtors' prepetition lenders that would increase the loan amounts, borrowing capacity, and make changes to the relevant

---

[22] D.I. 2581-19.

[23] D.I. 2581-20; D.I. 4238-7.

[24] D.I. 2581-23.

[25] *See* Complaint, *Yellow Corp. v. Int'l Brotherhood of Teamsters*, No. 6:23-cv-01131 (D. Kan. June 27, 2023).

[26] D.I. 4016-1 at 66 of 94.

[27] D.I. 2580 at 4 n.2.

collateral.[28]   On July 7, the debtors reached an agreement with Apollo Global Management (a prepetition lender) to waive its minimum EBITDA covenant and reduce the minimum liquidity requirement.[29]  With these changes, the company said that it believed it had "runway through the end of 2023 to work to get the International Brotherhood of Teamsters back into negotiations."[30]

On July 15, however, Yellow failed to make its required payment to Central States.   On July 17, Central States notified the debtors and their employees that Yellow was delinquent, that their participation in the fund would terminate on July 23, and that health coverage would be suspended unless payment was made.[31]  The same day, as a result of the Central States notice, the Teamsters issued a notice that they would go on strike beginning 72 hours later, unless the deficiency was cured.[32] The undisputed testimony is that this notice came as a surprise to the Yellow officials involved in the negotiations.[33]

On July 20, the debtors sent a final email to employees explaining that the Teamsters Union "ha[s] chosen to degrade the company – your company – via social media instead of having direct, productive negotiations that could put Yellow on a better path and save 30,000 jobs."[34]

---

[28] *Id.* at 4; D.I. 3794-1 at 24-25 of 139.

[29] D.I. 2580 at 4-5.

[30] D.I. 4016-1 at 17 of 94.

[31] D.I. 3729-2 at 129 of 135.

[32] D.I. 2581-26.

[33] D.I. 2581 at 26-27; D.I. 4291-2 at 11 of 14.

[34] D.I. 2581-27.

Following the strike notice, demand for Yellow's services declined precipitously. From July 11 to 18, the company picked up between 40,512 and 45,109 new shipments. On July 19, new shipments declined to 32,528, and fell further to 22,386 on the 20th and 10,458 on the 21st.[35]

On July 23, the Teamsters asked Central States to extend benefits to the debtors' employees to avert the strike. The fund agreed and the strike was called off.[36] Yellow's management told drivers to "run wide open" and pick up as much freight as possible.[37] The Board of Directors met that evening. Darren Hawkins, Yellow's CEO and board member, said that the strike notice had caused a "customer exodus" and customer return, even after a successful resolution of the labor issues, "is not guaranteed and would take an unpredictable amount of time."[38] Cody Leung Kaldenberg of Ducera told the Board that, in her view, it would no longer be possible to obtain either bridge financing or a broader refinancing of the company's debt.[39]

The minutes of the Board meeting reflect that while the Board was discussing Chairman Matthew Doheny's motion to terminate discussions with the Teamsters, the union issued a press release announcing the reopening of talks between the company and the union.[40] The Board responded by directing Hawkins to speak with

---

[35] D.I. 3729-1 at 136 of 139.

[36] D.I. 4016-1 at 58 of 135; 4286-1 at 38 of 58 (Hawkins Dep. Tr. at 95:11-96:12).

[37] D.I. 4016-1 at 10 of 94.

[38] *Id.* at 20 of 944.

[39] *Id.*

[40] *Id.* at 21 of 94.

the Teamsters, but making clear that any agreement would need to be contingent on the company obtaining financing, "which would be very difficult to obtain given the current and potentially irreversible circumstances."[41]

The next day, customer demand ticked up a bit. The company picked up 17,695 new shipments, but Yellow decided to stop accepting new orders to ensure the existing orders could be fulfilled.[42] That evening, the Teamsters provided the company with a term sheet that would allow implementation of Phase 2 of One Yellow and facilitate wage increases over the next five years.[43]

On July 25, the company picked up 11,109 new shipments. The Teamsters and the company agreed to the preliminary terms, but the agreement was short-lived. During a July 26 meeting of the Board of Directors, the Board concluded that the pace of liquidity decline meant the deal was no longer feasible without additional financing, which the minutes reflect, "no longer appears possible under current circumstances."[44] The company picked up 726 new shipments on the 26th, and 178 on the 27th.[45]

On July 28, the company laid off 3,500 non-union employees and picked up 43 new shipments.[46] The same day, the company sent WARN notices to affected

---

[41] *Id.*

[42] D.I. 2581 at 28.

[43] D.I. 3729-2 at 4-5, 131 of 135.

[44] D.I. 4016-1 at 23-24.

[45] D.I. 3729-1 at 137 of 139.

[46] D.I. 2581 at 30; D.I. 4016-1 at 23.

employees via the company's Oracle portal.[47]  The WARN notice sent to these non-union employees read:

> We regret to inform you that your employment with Yellow Corporation, or one of its subsidiaries, (collectively referred to as the "Company") will permanently terminate on July 28, 2023, or within 14 days after (the "Separation Date").  The Company is shutting down its regular operations on July 28, 2023, closing and/or laying off employees at all of its locations, including yours (the "Shut Down").  The Company submits this notice to you in part to satisfy any obligation that may exist under the federal Worker Adjustment and Retraining Notification Act, 29 U.S.C. § 2101 *et seq.* and applicable similar state laws (collectively, the "WARN Act"). The Company does not admit that such laws apply or that notice is required. If no obligations exist, this notice is being provided to you voluntarily. The Company was not able to provide earlier notice of the Shut Down as it qualifies under the "unforeseeable business circumstances," "faltering company," and "liquidating fiduciary" exceptions set forth in the WARN Acts.[48]

The notice also included a release of claims, which explicitly included WARN Act claims.[49]  The notice stated that the company would provide a severance payment that was "contingent upon [the employee] executing and continuing to comply with the terms of the Release."[50]  While the summary judgment record is less than clear in explaining how or why the decision was made (beyond the commonsense inference associated with bankruptcy law's general prohibition on making payment on prepetition obligations without court approval), at some point before the bankruptcy

---

[47] *Moore* Adversary, D.I. 122-1 at 70:4-70:15.  The parties agree that, at least in some instances, certain employees may not have had access to their notices until a few days later.

[48] D.I. 2581-28 at 2 of 4.

[49] D.I. 4291-4 at 4 of 67.

[50] *Id.* at 8 of 67.

petition was filed the company decided to make severance payments to all affected non-union employees regardless of whether the employee had executed the release.[51]

On July 29, one shipment was picked up. The next day, the last truck arrived at a terminal and the remaining union employees, approximately 22,000 of them, were terminated.[52] The debtors issued WARN Notices on July 31. The unionized employees were sent a slightly different WARN Notice. It read, in relevant part:

> The Company was not able to provide earlier notice of the Shut Down as it qualifies under the "unforeseeable business circumstances," "faltering company," and "liquidating fiduciary" exceptions set forth in the WARN Act. The Company expects all layoffs and location closures relating to the Shut Down to be permanent. The Company had hoped to complete one or more transactions and secure funds and business to prevent the closing of these locations but was unable to do so. These circumstances were not reasonably foreseeable at the time notice would have otherwise been required and notice is further excused because the business is being liquidated.[53]

On August 2, the Board met with its bankruptcy counsel regarding its going-forward operations and financing. "By this point, the sole purpose of Yellow's remaining employees was to liquidate the company and wind down the bankruptcy estate."[54] The board then authorized the filing of a chapter 11 petition on August 6, 2023.[55] The petition was in fact filed on that date.[56]

---

[51] *Id.*

[52] D.I. 2581 at 30-31.

[53] D.I. 2778-1 at 259 of 259 (emphasis added).

[54] D.I. 2581 at 32.

[55] *Id.*

[56] D.I. 1.

Various parties, including individual employees, unions, pension funds, and government entities, filed proofs of claim asserting liability for alleged violations of the WARN Act.  Separately, two adversary proceedings were filed asserting WARN Act liability.  In *Moore v. Yellow*, individuals sought to represent a class of non-bargaining unit employees who were terminated without proper notice and, allegedly, did not sign a valid release of their claims.[57]  In *Coughlen v. Yellow*, union and non-union employees retained a separate law firm to assert their WARN Act claims.[58]

In March 2024, the debtors objected to all the WARN Act claims.[59]  While both adversary proceedings were filed as purported class actions, a motion to certify a class was filed only in *Moore*.[60]  On April 10, 2024, the Court preliminarily observed (in advance of a hearing on class certification) that it was inclined to certify a class in *Moore* but not in *Coughlen*.[61]  At the April 11, 2024 hearing, the parties broadly agreed to proceed in that fashion.[62]  The Court thereafter entered an order granting class certification in *Moore*.[63]

---

[57] *Moore* Adversary, D.I. 12 (first amended complaint).

[58] *Coughlen* Adversary, D.I. 1.

[59] D.I. 2576, 2577, 2578.

[60] *Moore* Adversary, D.I. 26.

[61] *Moore* Adversary, D.I. 47.

[62] April 11, 2024 Hr'g Tr. at 6-50.

[63] *Moore* Adversary, D.I. 69.  The Court has not entered such an order in *Coughlen*.  The plaintiffs in *Coughlen* nevertheless state in their brief that their "class is currently comprised of 492 former employees including 466 former employees who have opted out of union-provided representation and 26 non-Union employees who have opted out of class representation."  *Coughlen* Adversary, D.I. 54 at 1 n.2.  The Court reads this reference to a "class" to mean that each of the 492 listed claimants have individually engaged counsel in the *Coughlen* case to represent them in litigating the allowance of their claims, and that these

Discovery has proceeded, in a coordinated fashion, in the two adversary proceedings as well as in the contested matters in which the debtors have objected to proofs of claim asserting WARN Act liability.  Along the way, the *Moore* plaintiffs filed a motion for summary judgment.[64]  After the unions filed a similar motion in June, the Court deferred resolution of the motion in *Moore* so that all WARN Act motions for summary judgment could be heard together.[65]

The various plaintiffs and claimants filed motions or amended their prior motions and the debtors responded.  The principal issues raised in the partial motions for summary judgment relate to (a) the availability of three affirmative defenses to liability under the WARN Act, and (b) whether many of the *Moore* plaintiffs validly released their WARN Act claims.  The motions also present additional state law issues.  The Court held argument on these motions on October 28, 2024.  Trial is scheduled to take place in these proceedings on those matters as to which summary judgment is not granted from January 21, 2025 – January 23, 2025.[66]

## Jurisdiction

The district court has subject-matter jurisdiction over this adversary proceeding under 28 U.S.C. § 1334(b), as a dispute "arising under" § 502 of the Bankruptcy Code.  This case has been referred to this Court under 28 U.S.C. § 157(a)

---

claimants are therefore parties in the *Coughlen* adversary proceeding.  To the extent the parties' understanding is different, the Court asks that counsel explain their positions on this issue in advance of trial.

[64] *Moore* Adversary, D.I. 42.

[65] D.I 3728; *Moore* Adversary, D.I. 79.

[66] D.I. 5053; *Moore* Adversary, D.I. 175; *Coughlen* Adversary, D.I. 138.

and the district court's standing order of February 29, 2012.  These disputes are core

matters under 28 U.S.C. § 157(b)(2).

## Analysis

Summary judgment is appropriate when "there is no genuine dispute as to any

material fact and the movant is entitled to judgment as a matter of law."[67]  When

conflicting evidence is presented and inferences must be made, the court must draw

all reasonable inferences in favor of the non-moving party.  The court cannot resolve

disputed questions of fact.[68]  The judge does not weigh the evidence, but only

determines whether the issue, as presented, is definitively resolved by the record

evidence.[69]

**I.     Though the faltering company and unforeseeable business circumstance exceptions are available on the merits, the claimants are entitled to summary judgment because the debtors failed to provide a sufficiently detailed form of notice.**

As a general proposition, the WARN Act provides that an employer may not

order a plant closing or mass layoff until 60 days after the employer provides written

notice to, among others, "each representative of the affected employees as of the time

of the notice or, if there is no such representative at that time, to each affected

employee."[70]  The statute, however, provides two relevant bases for reducing the

statutory notice period – the faltering company exception provided in § 2102(b)(1) and

---

[67] Fed. R. Civ. P. 56 made applicable by Fed. R. Bankr. P. 7056.

[68] *Ciarlante v. Brown & Williamson Tobacco Corp.*, 143 F.3d 139, 145, 148 (3d Cir. 1998); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986).

[69] *Ciarlante*, 143 F.3d at 145, 148; *Liberty Lobby,* 477 U.S. at 249.

[70] 29 U.S.C. § 2102(a).

the unforeseeable business circumstances exception provided in § 2102(b)(2)(A).[71] The statute is clear, however, that an "employer relying on [these exceptions] shall give as much notice as is practicable and at that time shall give a brief statement of the basis for reducing the notification period."[72]

### A. The statutory exceptions apply as a substantive matter.

#### 1. The debtors substantively qualify for the faltering company exception.

The faltering company defense allows an employer to "order the shutdown of a single site of employment before the conclusion of the 60-day period" if, "as of the time that notice would have been required," the employer (a) "was actively seeking capital or business which, if obtained would have enabled the employer to avoid or postpone the shutdown" and (b) "the employer reasonably and in good faith believed that giving the notice required would have precluded the employer from obtaining the needed capital or business."[73]  As the text of the statute indicates, the faltering company exception asks whether the employer was seeking capital as of the date that was 60 days before the layoff.  If so, it is excused from the obligation to provide notice for the period during which the terms of the defense are satisfied.  If an employer ceases its efforts to raise capital within the 60-day period before a layoff, in the absence of the

---

[71] A third exception, for layoffs due to any form of natural disaster," provided in 29 U.S.C. § 2102(b)(2)(B) is not applicable here.

[72] 29 U.S.C. § 2102(b)(3).

[73] 29 U.S.C. § 2102(b)(1).  *See also In re APA Trans. Corp. Consol. Litig.*, 541 F.3d 233, 246-247 (3d Cir. 2008).

availability of another exception, it is required to provide a WARN Act notice at that time.[74]

To show that it is actively seeking capital, an employer must demonstrate that it was doing more than just contemplating the possibility of soliciting additional financing.[75] The employer must show that it was taking "the specific steps required" to obtain new financing at the time when the 60-day notice would have been required.[76] The Department of Labor's regulations define new financing as the "arrangement of loans, the issuance of stocks, bonds, or other methods of internally generated financing;" or some other commercially reasonable method.[77]

The plaintiffs argue that the debtors do not qualify for the faltering company exception for three reasons: (1) they were not actually seeking new capital on the day notice would have been due; (2) they did not have a realistic chance of obtaining it, and (3) they have not presented evidence showing that they actually considered issuing a WARN notice.[78]

---

[74] The statutory language does not by its terms address a related question about which the Court enquired of the parties during the summary judgment argument – whether the back pay provided under 29 U.S.C. § 2104(a)(1)(A) is available to an employee if (a) on the day that was 60 days before the plant closing or mass layoff, no statutory exception is applicable, but (b) the employer was seeking to raise capital for some of the 60-day period between the date that notice was required and the date of the shutdown or layoff.

[75] *APA Trans. Corp.*, 541 F.3d at 249.

[76] *In re Jevic Holding Corp.*, 496 B.R. 151, 159 (Bankr. D. Del. 2013); *APA Trans. Corp.*, 541 F.3d at 248.

[77] 20 C.F.R. § 639.9(a)(1).

[78] D.I. 4286 at 20-21.

The debtors laid off their non-union employees on July 28 and their union employees on July 30, 2023.  Accordingly, as to the union and non-union employees, the debtors were required to have been seeking capital on May 31, 2023, and May 29 respectively, in order to avail themselves of the faltering company defense.[79]  The debtors outlined three ways in which they sought additional financing: *first*, by soliciting new business through the One Yellow initiative; *second*, by refinancing their existing debt; and *third*, by seeking new capital from outside sources.

The One Yellow initiative was designed to reorganize the debtors' internal operations and thus improve the company's revenue.  It is true that the statute provides that a company that is actively seeking "business," as well as "capital," may invoke the faltering company defense.  But an internal reorganization such as One Yellow, which is designed to improve revenue over time by generating efficiencies, does not fit within the statutory exception.  The statutory context makes clear that it contemplates the kind of immediate cash infusion that would save a flagging company from collapse.[80]  So, for example, if the company were seeking to obtain a loan or a commercial contract that would generate enough revenue to save the business, then it would make sense that issuing a WARN notice could undermine those negotiations.  Those are the kinds of circumstances for which the statutory exception is designed.  The type of internal restructuring contemplated by the One

---

[79] *Hotel Emps. & Rest. Emps. Int'l Union Loc. 54 v. Elsinore Shore Assocs.*, 173 F.3d 175, 18 (3d Cir. 1999) (where layoffs occur over a 14-day window, the relevant day for the faltering company exception is the first day of the layoffs, not the last).

[80] *See* 29 U.S.C. § 2102(b)(1); 20 C.F.R. § 639.9(a); *In re APA Trans. Corp.*, 541 F.3d at 248-249.

Yellow initiative is not, and it is therefore insufficient to support the faltering company defense.

The debtors' work with their investment banker, however, both to refinance existing debt as well as to attract new capital, presents a stronger case. In early 2023, the debtors retained Ducera as their investment banker to address their liquidity needs. On May 26, Ducera sent a financing proposal to Yellow's existing lender that would have freed up existing collateral and generated $100 million in new liquidity.[81] The unions assert that offering to free up collateral in exchange for additional credit is not the same as seeking new financing.[82]    That contention, however, blinks commercial reality. The whole point of seeking to unencumber assets that were otherwise liened up was to permit the company to borrow against those assets to bring in new capital. Indeed, the summary judgment record clearly indicates that the debtors' efforts, through Ducera, to explore options either to refinance existing indebtedness or to attract new capital was sufficient to fall within the faltering company exception.

It is true, of course, that those efforts were ultimately unsuccessful. The statute, however, requires only that the employer be "actively seeking capital" to qualify for the WARN Act exception.[83]    It does not require the employer to have a consummated offer in hand, or even an offer on the table. Retaining an investment

---

[81] D.I. 4291-3 at 3-4 (Kaldenberg Declaration); D.I. 3794-1 at 24-25 of 139.

[82] D.I. 4036 at 20.

[83] 29 U.S.C. § 2102(b)(1).

banker that is actively engaged in exploring the market for sources of new liquidity is precisely the kind of activity that qualifies under the faltering company exception.

The unions further argue that the debtors do not qualify for the exception because, although Ducera sent a proposal to Apollo and the U.S. Treasury for new financing on May 26, 2023, the debtors cannot point to specific activity related to the effort to obtain financing that occurred on either May 29 or May 31, 2023.[84]  That argument fails.  To be sure, if there were record evidence that the debtors' proposal was rejected on May 27, 2023 and that the debtors thereafter abandoned their efforts to raise capital, that would be another matter.  But that is not at all what the record suggests.  Rather, the evidence is undisputed that Ducera was actively engaged in efforts to identify potential sources of new capital until the precipitous decline in the debtors' business occasioned by the Teamsters' strike notice rendered those efforts futile.[85]

The unions also contend that Yellow could not have thought that it had a realistic chance to obtain new financing because any new financing would necessarily have been contingent on the Teamsters and Yellow coming to an agreement on the One Yellow initiative.[86]  The Teamsters argue that Yellow should have known that, given the union's negotiating posture, they were not going to reach such an agreement, and therefore there was never a realistic prospect of raising new capital.

---

[84] D.I. 4487 at 15.

[85] *See* D.I. 2580 at 4-6 (Kaldenberg Declaration, detailing Ducera's efforts throughout the applicable period).

[86] D.I. 4487 at 17-18.

As discussed further below, however, the record makes clear that Yellow and the Teamsters had a long history of engaging in brinksmanship, but, until the events of July 2023, had, in the end, always reached an agreement. Indeed, the point is only underscored by O'Brien's deposition testimony, where he explained that he also anticipated that the parties would ultimately be able to come to a consensual resolution of their dispute.[87]

The union and non-union plaintiffs further argue that the debtors have not presented evidence that they *actually* considered issuing a WARN notice when it would have been due.[88] While that is true, the law does not require the debtors to have *subjectively* considered having issued a WARN notice. Rather, the statutory exception requires only that a reasonable company in the employer's circumstances would not have issued a WARN notice because doing so would prevented the company from obtaining new financing.[89]

The record thus supports a finding that Yellow was, in fact, a faltering company at the time notice would have been due.

### 2. The debtors substantively qualify for the unforeseeable business circumstances exception.

The unforeseeable business circumstances exception allows an employer to provide less than 60 days' notice if the layoff is "caused by business circumstances

---

[87] *See* O'Brien testimony contained in D.I. 4673-2 at 213-230, discussed in Part I.A.2, *infra*.

[88] *See* D.I. 4487 at 18-19; *Moore* Adversary, D.I. 113 at 14.

[89] *See In re Organogenesis Inc.*, 316 B.R. 574, 586 (Bankr. D. Mass. 2004) (finding that the debtor held a reasonable belief that advance written termination notices would have precluded it from obtaining the company saving financing).

that were not reasonably foreseeable as of the time" notice would have been required, meaning 60 days before the layoff in fact occurred.[90]  To qualify, the employer must show that (1) "the circumstance was unforeseeable," and (2) "the layoffs were caused by" the unforeseeable circumstance.[91]  As a result of this statutory exception, when a layoff is precipitated by an unexpected, sudden, and precipitous decline in business, the employer is not liable under the WARN Act for having failed to provide notice 60 days in advance.

The question of whether the precipitating event was unforeseeable turns on how probable it was that the event would occur.[92]  The trigger "does not need to be an out-of-the-blue event."[93]  Instead, the court must ask, applying an objective standard, "whether a similarly situated employer" using its "commercially reasonable business judgment would have foreseen" the businesses' closure as of the date notice would have been required.[94]  And in that regard, the caselaw recognizes that employers are permitted to take a reasonably optimistic view of their future prospects.[95]

The summary judgment record makes clear that the debtors' shut down was caused by an unforeseeable business event.  The Teamsters point out that the debtors were aware of their precarious financials and understood that the Teamsters were an

---

[90] 29 U.S.C. § 2102(b)(2)(A).

[91] *In re Start Man*, 647 B.R. at 135-136.

[92] *In re Jevic Holding Corp.*, 496 B.R. 151, 160-161 (Bankr. D. Del. 2013).

[93] *Id.* at 161.

[94] *Hotel Emps. & Rest. Emps.*, 173 F.3d at 186 (internal quotations omitted).

[95] *See id.* (concluding that closing of casino was unforeseen when operator "appeared determined to keep the Atlantis open or to sell it to a purchaser who would be able to do so.").

obstacle to implementing One Yellow. They argue that the debtors' demise was therefore foreseeable. That argument, however, appears to reflect a paradigmatic case of hindsight bias. The question asked by the WARN Act is not whether, after the fact, one can identify signs of trouble that might have existed 60 days before the layoff. Rather, the relevant question is whether the closure can be said to have been "probable" at any point before it occurred. Fairly read, the summary judgment record makes clear that it was not.

Instead, the summary judgment record shows a history of brinksmanship. The debtors and the Teamsters had engaged in high-stakes negotiations five times before, and each time they had come to resolution.[96] In light of this history, Yellow had every reason to believe in the summer of 2023 that the Teamsters would come to the table before the clock ran out. There is no dispute that the debtors were in fact surprised to have received the strike notices from the Teamsters.[97] And the record shows that the union itself had not anticipated that its strike notice would have the consequences that it did. Indeed, it is not too much to say that Yellow's ultimate failure was caused, at least in substantial part, by the Teamsters' miscalculation about the effect of sending a strike notice. Sean O'Brien, the Teamsters' president, when asked at his deposition whether he expected that Yellow would go out of business as a result of

---

[96] D.I. 4452 at 18-19.

[97] D.I. 2581 at 26-27 (Hawkins explaining that he expected "the Union would ultimately act in its own best interest—and in the interest of the union members—and not act to permanently eliminate 22,000 union jobs, as it did."); D.I. 4291-2 at 10 (Hawkins stating that he was "shocked" to receive the Teamsters' strike notice since, based "on Yellow's extensive negotiating with IBT, Yellow had expected that IBT would not destroy the Company.").

the strike notice, said simply: "I did not."[98]  He explained that even after issuing the strike notice, the Teamsters were "willing to reach an agreement [with Yellow] like we are with every other employer."[99]  And when asked whether the Teamsters intent was "still to negotiate with Yellow even after issuing the strike notice," he responded, "[o]f course it was."[100]

The Teamsters were of course well within their rights to issue the strike notice after the debtors failed to make the required payment to Central States.  The debtors, however, did not expect that the Teamsters would actually do so.  What O'Brien apparently failed to appreciate, however, was the fact that issuing the strike notice would set in motion an irreversible course of events beginning with Yellow's customers fleeing the business and ending in Yellow's liquidation.  It turns out that events unfolded in a way that surprised both the company and the Teamsters.  Under the circumstances, however, the arguments by the employees (most of whom are members of, and are now represented by, the Teamsters) that Yellow should have foreseen the collapse 60 days before it occurred and issued a WARN notice at that time rings quite hollow.

The plaintiffs offer various responses to this point, none of which has merit. The contention that the debtors' failure to pay Central States on time made it likely that the layoffs would occur is unpersuasive because, as described above, not even

---

[98] D.I. 4673-2 at 221 of 230 (O'Brien Dep. Tr. at 135).

[99] *Id.*

[100] *Id.* at 223 of 230 (O'Brien Dep. Tr. at 137).

the Teamsters expected events to unfold as they did.  The Teamsters also argue that the issuance of the strike notice was foreseeable.  In support, they point to a statement made in a declaration by John Murphy, the co-chairman of the Teamsters' negotiating committee, in which Murphy states that he told Bryan Reifsnyder, Yellow's Senior Vice President of Trucker Relations, in the middle of July (but before July 17) that "[the union] will strike [Yellow]" if it did not pay its July 2023 contributions.[101]

The issue, however, is not whether the strike notice was foreseeable, but whether the collapse of the business, leading to the layoffs, was.  And the Teamsters themselves, through O'Brien's testimony, have made clear that they did not expect that the strike notice would cause the business to fail.  In substance, then, Teamsters are asking this Court to find that a reasonable employer in Yellow's position would have expected the Teamsters to miscalculate as they did, based on Murphy's statement to Reifsnyder.  Nothing in the record, or in common sense, would support that conclusion.[102]  Rather, the summary judgment record makes clear that the layoffs were "caused by business circumstances that were not reasonably foreseeable at the time," within the meaning of the WARN Act.

---

[101] DI. 4286-2 at 2.

[102] The Court accordingly has no reason to address Yellow's argument, *see* D.I. 4452 at 51, that Murphy's declaration should be disregarded under the "sham affidavit" doctrine, which generally bars a party from seeking to manufacture a genuine dispute of material fact by submitting an affidavit that contradicts the affiant's own prior testimony.  *See Baer v. Chase*, 392 F.3d 609, 623-624 (3d Cir. 2004); *See also Hackman v. Valley Fair*, 932 F.2d 239, 241 (3d Cir. 1991).

**B.    As a procedural matter, the debtors cannot avail themselves of either statutory exception because their notices were deficient.**

For an employer to invoke either statutory exception, it must "give as much notice as is practicable and at that time shall give a brief statement of the basis for reducing the notification period."[103]  The brief statement must be based on "the best information available to the employer" at the time notice was provided.  The notice need not reflect a particular form, but it must be written and must be issued in a manner designed to ensure receipt.[104]  The WARN notice must, among other things, inform affected employees of an imminent and permanent job loss.[105]

A WARN notice that simply recites the statutory basis of the claimed exception is insufficient.[106]  Instead, like the familiar principle that a complaint that merely recites the elements of a claim is "conclusory" and that factual allegations are required, the notice must contain enough facts to allow an affected employee to assess whether the notice period was properly reduced.[107]   Multiple documents may constitute a single valid WARN notice.[108]

---

[103] 29 U.S.C. § 2102(b)(3).

[104] 20 C.F.R. §§ 639.7(a)(4), 639.8; 29 U.S.C. § 2102(a).

[105] 20 C.F.R. § 639.7.

[106] *In re Tweeter Opco, LLC*, 453 B.R. 534, 547 (Bankr. D. Del. 2011); *Grimmer v. Lord Day & Lord*, 937 F. Supp. 255, 257 (S.D.N.Y. 1996) (quoting *Alarcon v. Keller Indus.*, 27 F.3d 386, 389) (9th Cir. 1994)).

[107] *In re Tweeter Opco*, 453 B.R. at 547. *See generally Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (The "tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions.  Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice.").

[108] *See Kalwaytis v. Preferred Meal Sys., Inc.*, 78 F.3d 117, 121-122 (3d Cir. 1996).

The Third Circuit has explained that courts should take a "practical and realistic" approach to whether the notice provided satisfies the statutory requirement.[109]  The applicable regulations are to the same effect, providing that a notice that largely complies with the statute should not fail because of some "minor, inadvertent errors."[110]

### 1.    The formal WARN Act notices were insufficient.

Yellow sent different notices to their union and non-union employees.[111]  Both were insufficient to invoke the statutory exceptions because the 'brief statement' did not contain enough facts adequately to justify the reduced notice.

### a.    The non-union notices were insufficient.

The non-union notices, quoted in full above on page 14, did not contain any facts with respect to either of the asserted statutory exceptions.  Rather, they simply stated that the company was "not able to provide earlier notice" because it "qualifies under the unforeseeable business circumstances, faltering company, and liquidating fiduciary exceptions."[112]  This is insufficient.  These notices contain the kind of conclusory recitation of the elements, devoid of actual facts (besides the date of termination), prohibited by applicable law.  As such, the non-union WARN notice is insufficient.  Accordingly, despite the fact that both of the statutory defenses were available to the debtor on the merits, the failure to provide a notice that comported

---

[109] *Id.*; *Marques v. Telles Ranch, Inc.*, 867 F. Supp. 1438, 1445 (N.D. Cal. 1994).

[110] 20 C.F.R. § 639.7(a)(4).

[111] *See* D.I. 2581 at 31; D.I. 2581-28 at 2.

[112] D.I. 2581-28 at 2 (internal quotation marks omitted).

with the "brief statement" requirement of § 2102(b)(3) bars the debtors from relying on the statutory exceptions.

### b.    The union notices were also insufficient.

The WARN notices that were sent to union employees, quoted in full above on page 15, contained slightly more detail.  They informed employees that (1) the company had "hoped to complete one or more transactions and secure funds" to prevent the shutdown but failed to do so; and (2) "[t]hese circumstances were not reasonably foreseeable" when notice would have been required and, in any event, "notice is further excused because the business is being liquidated."[113]

*Unforeseeable business circumstances.*    As to the unforeseeable business circumstances exception, the debtors' notice is inadequate since it contains no factual statement about the nature of the unforeseeable circumstances.  The caselaw recognizes that by forcing employers to provide enough facts to justify the reduced notice, the Act requires the employer to articulate the reason for the business failure at the time of the layoff.  If nothing else, this prevents an employer whose demise was fully foreseeable 60 days beforehand from conjuring, in litigation, a *post hoc* "surprising" event that it claims caused the business to fail.[114]

---

[113] D.I. 2581 at 31.

[114] *See Grimmer*, 937 F. Supp. at 257 (describing the purpose of the factual statement as prohibiting employers from relying on vague justifications for reducing notice); *Weekes-Walker v. Macon County Greyhound Park, Inc.*, 877 F. Supp. 2d 1192, 1207 (M.D. Ala. 2012) (citing the rationale in *Grimmer* and observing that the factual statement serves to prevent employers from asserting a litigation convenient but factually *post hoc* justification).

Crafting an appropriate WARN Act notice that set forth the facts supporting the unforeseeable business circumstances defense would not have been difficult. A simple statement would suffice, such as "the Company did not expect that the Teamsters would issue strike notices, which in turn caused irreparable harm to the Company's business." The notice, however, did not mention the strike notice, or even the wider dispute with the Teamsters, in any way. The notices are therefore inadequate to permit the debtors to invoke the unforeseeable business circumstances defense.

*Faltering company.* Whether the separation notices qualify for the faltering company exception presents a closer question. These notices state that "[t]he Company had hoped to complete one or more transactions and secure funds and business to prevent the closing of these locations but was unable to do so." This certainly comes close to describing the underlying facts that give rise to the faltering company exception. As further described below, this language is both more specific than any notice that has been held to be inadequate, but also more general and conclusory than any notice that has ever been held to be sufficient. The chart set forth below describes the notice language in each prior judicial decision of which the Court is aware that turned on the sufficiency of the WARN Act notices.[115]

---

[115] Those cases shaded in green involve notices found to be sufficient; those in red were found to be insufficient. The cases are listed from those that (in this Court's judgment) contained the most specific notices to those whose notices are the most conclusory.

| Case | Disclosure language | Outcome |
|---|---|---|
| *In re AE Liquidation, Inc.*, 866 F.3d 515 (3d Cir. 2017) | "We are very sad to report unexpected news today. Despite the efforts of many people at EclipseJet Aviation and ETIRC to obtain necessary funding to close the purchase of the assets of Eclipse Aviation, the closing of the sale transaction has stalled and our company is out of time and money. Given the dire circumstances in today's global marketplace and the lack of additional debtor-in-possession funding, the senior secured creditors of the Company filed a motion today in US Bankruptcy Court in Delaware to convert the Chapter 11 case to a Chapter 7 liquidation. This action, under the circumstances, is being supported by the directors of Eclipse."[116] | Sufficient because it helped "employees understand the employer's situation and its reasons for shortening the notice period.'"[117] |
| *Alarcon v. Keller Indus., Inc.*, 27 F.3d 386 (9th Cir. 1994) | "The operating performance of the furniture division has been disappointing and the substandard working capital required of business does not make it a viable entity. In an attempt to save the jobs of the Furniture Division employees, Keller pursued several options for possible purchase, but was unable to secure a qualified buyer. Further, Keller was unable to find parties interested in supplying the enormous working capital for such a high risk and under performing business.... Please consider this letter to be your official notice as required by the federal plant closing law, and specifically, by 2102 Section 3(b)(1) of the Worker Adjustment and Retraining Notification Act of 1988."[118] | Sufficient because it provided "an adequate, specific explanation to affected workers."[119] |

---

[116] *In re AE Liquidation, Inc.*, 866 F.3d 515, 524 (3d Cir. 2017)

[117] *Id.* at 525 (internal brackets, quotations, and citations omitted).

[118] *Alarcon v. Keller Indus., Inc.*, 27 F.3d 386, 388 (9th Cir. 1994).

[119] *Id.* at 390.

| *In re Yellow Corporation*, Bankr. (Bankr. D. Del. No. 23-11069, Dec. 19, 2024) | The Company was not able to provide earlier notice of the Shut Down as it qualifies under the 'unforeseeable business circumstances,' 'faltering company,' and 'liquidating fiduciary' exceptions set forth in the WARN Act. The Company expects all layoffs and location closures relating to the Shut Down to be permanent. *The Company had hoped to complete one or more transactions and secure funds and business to prevent the closing of these locations but was unable to do so.* These circumstances were not reasonably foreseeable at the time notice would have otherwise been required and notice is further excused because the business is being liquidated."[120] | Insufficient, as discussed below. |
|---|---|---|
| *In re United Furniture Indus., Inc.*, 2024 WL 4530208 (N.D. Miss. Oct. 18, 2024) | "This amended notice is being provided to you pursuant to the Worker Adjustment and Retraining Notification Act of 1988, 29 U.S.C. § 2101 et seq., which requires employers to give notice to affected employees of a pending mass layoff or plant closure. *Due to unforeseen business circumstances, and the inability to obtain sufficient financing to maintain operations, United Furniture Industries, Inc. (the "Company") made the difficult decision to terminate the employment of all of its employees and close all facilities, resulting in the end of your employment with the Company. Because the business circumstances were unforeseeable <u>and the Company was trying very hard to obtain financing to continue operations</u>, the Company was not able to provide you further advance notice of the separation.* As a result, all layoffs were effective immediately, on November 21, 2022. Your layoff from the Company was permanent, and there are no bumping rights available. Your wages, if any, were paid through November 21, 2022. Any benefits from the | Insufficient because the notices did not provide any facts that related to the specific circumstances that triggered the shut-down. |

---

[120] D.I. 2778-1 at Ex. 15.

| | | |
|---|---|---|
| | Company, including health care benefits, ended as of November 22, 2022, and there will be no continuation of benefits through the Consolidated Omnibus Budget Reconciliation Act of 1985. If you have not already done so, you should contact your local unemployment office for information regarding availability of unemployment insurance benefits.<br>We regret that this difficult and unexpected situation made this necessary. We again thank you for your service and dedication to the Company and wish you the best in your future endeavors. For further information concerning this notice, please contact Bill Burke at (662)-397-5124."[121] | |
| *In re Tweeter Opco*, 453 B.R. 534 (Bankr. D. Del. 2011) | The first notice stated: "Unfortunately, due to adverse business conditions outside our control, we are not able to give you advance notice."  The second notice stated: "As a result of our bankruptcy filing and the elimination of some services to our [customers], today we are conducting a significant reduction in our workforce and your position is directly affected by this reduction."[122] | Insufficient because the employer failed to provide any factual justification for the reduced notification period.[123] |

---

[121] *In re United Furniture Indus., Inc.*, No. 23-01005, 2024 WL 4530208, at *2-*3 (N.D. Miss. Oct. 18, 2024) (emphasis added).

[122] *In re Tweeter Opco*, 453 B.R. at 547 (internal citations omitted).

[123] *Id.*

| | | |
|---|---|---|
| *In re Jamesway Corp.*, 235 B.R. 329 (Bankr. S.D.N.Y. 1999) | "[Jamesway] will shut down its operation located at 66 Station Road Cranbury, N.J. 08512. It is expected that such shutdown will take place on or about $1^1/_1$, 1995, [sic] at which time Jamesway shall terminate all its employees. You may direct any questions involving this action to Human Resources at (201) 330–6384.  The first separation from employment as a result of this action is expected to occur on or about 10/13/1995, and all of the approximately 50 employees of Jamesway assigned to the site will be terminated on or about this date. Such termination from Jamesway is expected to be permanent.  A list of the job titles affected and the number of affected employees in each job classification may be obtained upon request.  No bumping rights are triggered by this action.  This notice shall not constitute, be construed or deemed a consent of Jamesway that the provisions of the WARN Act apply to the above mentioned shut down."[124] | Insufficient because it was missing various 'basic' WARN requirements and did not contain any basis for the reduced notice.[125] |

As a review of the chart above reveals, the notice of Yellow's efforts to raise capital certainly has less detail than the notices provided in either *AE Liquidation* (where a specific transaction failed to close) or *Alarcon* (which described the efforts to identify potential lenders and the reasons those efforts to raise capital were unsuccessful).  While the notice here is only marginally less informative than the one in *Alarcon*, the level of detail is, in fairness, likely closest to the notice that was found in to be insufficient in *United Furniture*.  The notice in that case said that "the company was trying very hard to obtain financing."  Similarly, the debtors' notice

---

[124] *In re Jamesway Corp.*, 235 B.R. 329, 341 (Bankr. S.D.N.Y. 1999).

[125] *Id.* at 340.

here said that "the Company had hoped to complete one or more transactions and secure funds and business to prevent the closing of these locations but was unable to do so."[126] Like the *United Furniture* notice, the debtors' notice only indicates that they had sought additional financing "without providing further elaboration or information" regarding the specific actions they took.[127]

This is certainly a close case. But applicable caselaw requires employers to provide *some* language specific to the company's circumstances in its notice in order to invoke the WARN Act's statutory exceptions. This would not have required much. In view of the caselaw described above, it is clear that a notice stating, for example, that the company had been working, through its investment banker, on potential transactions to refinance its existing indebtedness and/or to obtain new borrowings would have sufficed. One could certainly ask the question whether the claimants in this action would have been materially better off if only the debtors had included these few additional words in their WARN notices. In the Court's view, however, the only statutory hook for such an argument is the provision permitting the reduction of damages in cases of good faith set forth in 29 U.S.C. § 2104(a)(4) (discussed below in Part III). As a result, the Court concludes that the application of the standard set forth in the caselaw to the summary judgment record before it requires the conclusion that the debtors' notice did not contain enough factual specificity. The debtors therefore may not validly invoke the WARN Act's faltering company exception.

---

[126] D.I. 2778-1 at 259 of 259.

[127] *In re United Furniture Indus.*, 2024 WL 4530208, at *14.

2.  **Neither the debtors' other communications to its employees nor the fact that Yellow's demise was widely publicized excuses the debtors' failure to send compliant WARN Act notices.**

The debtors argue that the deficiencies in their separation notices can be cured by earlier correspondence they sent to employees and the fact that their business circumstances received widespread publicity.[128] The debtors are certainly correct that multiple documents can be read together to form a single, compliant, WARN notice. But that is only true when subsequent notices relate back to, and flesh out (or even correct), a factual story presented in the initial notice.[129]

For example, in *Kalwaytis v. Preferred Meal Sys., Inc.*,[130] the employer sent two notices.  The first stated that a third-party contractor was taking over certain operations and that they had an open offer of employment for affected employees.[131] This was not true, and a second notice was sent to clarify that there was no standing employment offer for affected employees.[132]  The court held that the subsequent clarification could be taken together with the originally erroneous notice to constitute a single, and effective, WARN notice informing employees of a pending termination.[133]

---

[128] *Moore* Adversary, D.I. 123 at 17-18.

[129] *See In re AE Liquidation Inc.*, 556 B.R. 609, 626 (D. Del. 2016) (describing the factual relationship between the notices at issue)*; Kalwaytis*, 78 F.3d at 122 (describing the factual updates provided in the subsequent notices).

[130] 78 F.3d 117 (3d Cir. 1996).

[131] *Id.* at 119.

[132] *Id.*

[133] *Id.* at 121-122.

In *AE Liquidation*,[134] the company also sent two notices.[135]  The first indicated that a furlough may go longer than expected because a company saving transaction had been delayed unexpectedly.[136]   The second informed employees that the transaction had stalled, the company was out of money, and that layoffs were imminent.[137]   The court, in reading the two notices together, held that they constituted a single WARN notice.[138]

These cases establish that a WARN notice may be liberally amended by subsequent notices so long as (i) the initial notice contains enough facts to lock the employer into a story; (ii) the subsequent notices (or amendments) relate back to the facts in the initial notice; and (iii) the subsequent notices (or amendments) are circulated before litigation on the issue commences.

None of those elements is satisfied here.  Here, the debtors had sent some number of emails to their employees, in the weeks leading up to the collapse of the business, while they were trying to persuade the Teamsters to engage with their proposals to implement One Yellow.  One email, for example, provided an update on negotiations with the Teamsters, then urged employees to "contact your local union to get everyone back to the [negotiating] table."[139]   Another indicated that the

---

[134] 556 B.R. 609 (Bankr. D. Del. 2016).

[135] *Id.* at 614-615.

[136] *Id.*

[137] *Id.* at 615.

[138] *Id.* at 626.

[139] D.I. 2581-18 at 4 of 4.

Teamsters' failure to negotiate is putting "jobs … on the line."[140]  The debtors may well be correct that as a result of having received these emails, the employees would have known or understood that the viability of the company (and therefore their own jobs) were on the line.  And while a case could be made that these emails served some of the same purposes that Congress had in mind when it required employers to provide notice in advance of a mass layoff, these emails simply cannot be described as WARN Act notices within the meaning of the statute.[141]

The debtors' argument about constructive notice is to similar effect.[142]  They argue that in the period between the strike notice and the layoffs, the company's circumstances were widely publicized.[143]  The gist of the debtors' argument is that because any American who was paying attention would have well understood the precarious nature of Yellow's business and therefore of the jobs of its employees, it is beyond hyper-technical to impose liability on the debtors for omitting, from their formal WARN Act notices, a few words that would not have told any employee anything that the employee would not have already known.

While the Court certainly has some sympathy for the commonsense appeal of this argument, the law does not, by its terms, provide a defense from WARN Act

---

[140] D.I. 2581-19 at 3 of 3.

[141] *See also In re TransCare Corp.*, 611 B.R. 160, 168-169 (Bankr. S.D.N.Y. 2020).

[142] *Moore* Adversary, D.I. 123 at 17-18.

[143] *See generally* Alan Rappeport, *After $700 Million U.S. Bailout, Trucking Firm Is Shutting Down* (July 28, 2023), https://www.nytimes.com/2023/07/28/business/bailout-trucking-firm-yellow-yrc-shutdown.html; Emma Bowman, *The Yellow trucking company meltdown, explained* (published July 30, 2023, as updated Aug. 3, 2023), https://www.npr.org/2023/07/30/1190960948/yellow-trucking-shutdown-explained.

liability in circumstances in which the deficiency of the formal notice might be seen as a form of harmless error.[144]    Rather, in order to avoid WARN Act liability, an employer is required to send a notice that complies with the statutory requirements.[145]  For better or worse, nothing in the statute allows a court to give the employer a free pass on the ground that the court sees little benefit to doing what the statutory language requires.

That principle is well illustrated by the court's decision in *Sides v. Macon County Greyhound Park*.[146]  There, a "greyhound track turned multi-million dollar casino" in Alabama became the target of an illegal gambling task force established by the state's governor.[147]  As a result of the investigation, the casino conducted a series of layoffs without providing any form of notice.[148]  Those layoffs gave rise to a series of WARN Act claims.[149]  While the casino had not provided any notice, it argued that the unforeseeable business circumstances exception applied, and that it was not required to provide formal notice under the statute because the events driving the casino's downfall were "entirely obvious to affected employees."[150]

---

[144] *See generally In re Art Van Furniture*, 638 B.R. 523, 540 (Bankr. D. Del. 2022); *Sides v. Macon County Greyhound Park, Inc.*, 725 F.3d 1276, 1285-1286 (11th Cir. 2013).

[145] 29 U.S.C. § 2102(a); 20 C.F.R. § 639.8.

[146] 725 F.3d 1276 (11th Cir. 2013).

[147] *Id.* at 1279.

[148] *Id.* at 1280.

[149] *Id.*

[150] *Id.* at 1285 (internal quotation omitted).

The court rejected that argument, concluding that the casino's "supposed 'notice' in the form of billboard ads [and] third-party paper articles" does not satisfy the requirement set forth in the WARN Act.[151]  These forms of notice "do not bear up to [the] fundamental requirement ... that an employer must give or serve a form of notice that will ensure delivery and receipt."[152]  As a statutory matter, this analysis is plainly correct and fully applicable here.[153]

## II.   The liquidating fiduciary exception does not apply to the layoffs of the non-union employees; the existing record does not permit the entry of summary judgment for either party on the application of the liquidating fiduciary exception to the union employees.

In addition to the exceptions to the WARN Act set forth in the statute, caselaw also recognizes a further defense to liability under the WARN Act known as the "liquidating fiduciary" exception.  The WARN Act defines an employer as a "business enterprise" that employs 100 or more employees.[154]  But the statute does not define the term "business enterprise."[155]  The Department of Labor has taken the position that a business enterprise includes entities that "engage in business (i.e., take part in a commercial or industrial enterprise; supply a service or good on a mercantile basis, or provide independent management of public assets, raising revenue and

---

[151] *Sides*, 725 F.3d at 1285.

[152] *Id.* at 1286.

[153] In view of this conclusion, there is no occasion for the Court to reach the *Moore* plaintiffs' separate argument that the distribution of the notices, shortly after the layoffs occurred, via the Oracle portal, was legally ineffective.  *See Moore* Adversary, D.I. 102, 4-6.

[154] 29 U.S.C. § 2101(a)(1).

[155] *See id.* § 2101(a).

making desired investments)."[156]  The Department of Labor's commentary, however, indicates that certain corporate entities should not be considered "business enterprises."[157]  When responding to a comment seeking to carve out fiduciaries of bankrupt companies, it suggested that a fiduciary "whose sole function in the bankruptcy process is to liquidate a failed business … does not succeed to the notice obligations."[158]  Caselaw has followed this regulatory guidance.[159]

Because the consequence of a defendant being a "liquidating fiduciary" is that a defendant is not an "employer" covered by the WARN Act, a company that qualifies for this defense is not subject to the notice obligations that otherwise apply to the express statutory exceptions.  The task, accordingly, is to discern the line that separates a "business enterprise" from a "liquidating fiduciary."

Often, the question of whether an entity is an "employer" turns on how closely the entity's activities resemble those of a business operating as going concern.[160]  The more closely the entity's activities "resemble those of a business winding up its affairs" the less likely the WARN Act is to apply.[161]  Generally, courts look at whether the company was continuing to "supply a service or good" as it would have done in the usual course of business.[162]

---

[156] 54 Fed. Reg. 16042, 16044 (1989)

[157] *Id.*

[158] *Id.* at 16045.

[159] *See In re United Healthcare Sys.*, 200 F.3d 170, 176-177 (3d Cir. 1999).

[160] *Id.* at 178.

[161] *Id.*

[162] *In re Start Man*, 647 B.R. 116, 129 (D. Del. 2022).

Though the commentary that gave rise to this exception discusses bankruptcy, the enquiry is not whether the entity has filed for bankruptcy, but whether the fiduciaries "have ceased their engagement in [the] business" in the ordinary commercial sense.[163]  It is of course true that companies can and commonly do wind down their affairs and liquidate outside of bankruptcy.  And on the flip side, the paradigmatic use of chapter 11 is to reorganize, rather than to liquidate, a business in financial distress.  For that reason, the filing (or timing) of a bankruptcy case is neither a necessary nor a sufficient condition to establish that a WARN Act defendant is a liquidating fiduciary.  Rather, the test asks an objective question.  Are there "signs of normal operations" within the company in the period immediately before the layoffs?[164]  A company that continues to operate some or all of its ordinary commercial business lines is generally not a liquidating fiduciary.[165]

In this jurisdiction, the leading case on this issue is the Third Circuit's decision in *United Healthcare Systems*.[166]  There, the court was asked to determine whether a bankrupt hospital system was an employer and therefore subject to the WARN Act.[167] United Healthcare provided healthcare services in New Jersey until acute financial troubles forced it into bankruptcy on February 19, 1997.[168]  On the same day United

---

[163] *Id.*

[164] *Id.* at 130.

[165] *In re United Health Sys.*, 200 F.3d at 174. *See also In re Start Man*, 647 B.R. at 129-130.

[166] 200 F.3d 170 (3d Cir. 1999).

[167] *Id.* at 172.

[168] *Id.* at 172-173.

Healthcare filed its bankruptcy petition, it "advised the New Jersey Department of Health that it would close and surrendered its certificates of need."[169]  By February 21, 1997, United Healthcare had either transferred its patients to another hospital or sent them home.[170]  At that point, the hospital was no longer providing care to any patients.[171]  On March 6, the company terminated all of its employees save for 100.[172]  The remaining workforce would do nothing more than "secure the plant facility and … maintain necessary equipment."[173]

The Third Circuit held that by February 21, 1997 (at the latest) United Healthcare was no longer operating as a going concern but was instead simply  in the process of liquidating.[174]  In the time before the layoffs, the court held, United Healthcare was not engaged in *any* part of its core business: treating patients.[175]  The court's analysis focused, not on the bankruptcy, but on the dramatic change in operations between the time at which the company decided to liquidate (February 21, 1997) and the layoffs (March 6, 1997).  By February 21, 1997, all the patients had been transferred away and the certificates of need had been surrendered.  That rendered the hospital unable to provide care and the employees were "no longer

---

[169] *Id.* at 173.

[170] *Id.*

[171] *See United Healthcare Sys.*, 200 F.3d at 173.

[172] *Id.*

[173] *Id.*

[174] *Id.* at 178.

[175] *See United Healthcare Sys.*, 200 F.3d at 178.

engaged in their regular duties but instead were performing tasks *solely* designed to prepare United Healthcare for liquidation."[176]

By contrast, in *Start Man Furniture*,[177] the company's exit from the conduct of its business was not as clear. There, the company was a furniture and mattress retailer that filed for chapter 11 bankruptcy protection.[178] Though the company initially hoped to re-open some stores, it ultimately converted the case to a chapter 7 liquidation and permanently laid off its employees.[179] Certain employees initiated an adversary proceeding arguing that they were not provided adequate notice under the WARN Act. In response, the trustee argued, among other things, that the debtor was a liquidating fiduciary at the time of the layoffs and therefore was not required to provide notice.[180]

The court rejected the trustee's argument. Even though the debtor was working towards an "orderly liquidation" and had taken steps to sell a substantial number of its stores, those sales were conditioned on those stores "maintaining their normal operations" before the sale closed.[181] The court further pointed out that the stores slated for closure were being operated in the same way as those slated for sale.

---

[176] *Id.* (emphasis added).

[177] 647 B.R. 116 (D. Del. 2022).

[178] *Id.* at 121.

[179] *Id.* at 125.

[180] *Id.* at 125-126.

[181] *Id.* at 131.

So, because the debtor's actions were the same as those it took on before it began to liquidate, the company did not qualify as a liquidating fiduciary.

Applying the test that emerges from the caselaw, the question is whether, at the time of the layoffs, the debtors were still engaged in their usual business activity. The record suggests the following timeline: After the issuance of the strike notice on July 17, 2023, the debtors' business fell off precipitously. While the debtors had typically picked up more than 50,000 packages a day, on July 27, 2023, they picked up only 178.[182]  The next day, July 28, 2023, they picked up only 43.[183]  That same day, the non-union employees were laid off.[184]  The day after that, on July 29, 2023, the debtors picked up their final shipment.[185]  That shipment was delivered on July 30, 2023.[186]  That same day, the debtors laid off the union employees.  The record does not indicate whether the layoff took place before or after the final delivery was completed.

In the real world, the process of exiting the business in which a company was operating and turning the company's focus to the liquidation of its assets for the benefit of its residual stakeholders is not something that happens at a single moment in time.  Instead, as the record here reflects, the process is more likely to be a gradual one as the business affairs are wound down and attention shifts to the process of

---

[182] D.I. 2581 at 29.

[183] *Id.*

[184] *Id.* at 30.

[185] *Id.*

[186] *Id.*

liquidating.  That said, a layoff does occur at a particular point in time.  And so, the liquidating fiduciary exception to the WARN Act requires the court to answer a question that is necessarily binary.  When the layoff took place, was the defendant an "employer" within the meaning of the statute, or not?

The Third Circuit's decision in *United Healthcare* addressed precisely that question.  The court identified the point when the hospital system "had discharged or transferred all of its patients and was no longer admitting new patients" as the time it ceased conducting a business.[187]  As of that time, its employees "were performing tasks solely designed to prepare United Healthcare for liquidation."[188]  Significantly, the opinion addressed the point when the hospital system had *both* stopped admitting new patients *and* had discharged or transferred existing patients as the relevant point when it was no longer an employer but was instead a liquidating fiduciary.

Applying that analysis here, it would necessarily follow that the debtors were no longer "employers" within the meaning of the WARN Act after they had *both* stopped picking up new shipments *and* delivered the final shipment.  And the record is clear that the date on which that occurred was July 30, 2023.  Accordingly, there is no dispute that the debtors were "employers" within the meaning of the WARN Act on July 28, 2023, when the non-union employees were laid off.  The record, however, does not reveal whether the July 30, 2023 layoff of the union employees occurred before or after the last delivery was completed, which occurred on that same day.  The

---

[187] 200 F.3d at 178

[188] *Id.*

48

Court will accordingly grant the non-union employees' summary judgment motions, and deny the debtors summary judgment motion, on the question whether the debtors were a liquidating fiduciary at the time of June 28, 2023 layoffs.  With respect to the union employees who were laid off on July 30, 2023, the only conclusion that the Court can reach is that there is a genuine dispute of material fact as to whether the liquidating fiduciary exception was applicable at when the layoff occurred.  The Court will accordingly deny both parties' motions for summary judgment on that issue.

## III.    Whether the non-union WARN claims were properly released cannot be decided on the current record.

The *Moore* plaintiffs and the debtors filed cross motions for summary judgment seeking a determination on the enforceability of the release of claims signed by a large number of the *Moore* class members. [189]

In the Third Circuit, an employee may waive an employment claim against his or her employer so long as the waiver is granted "knowingly and willfully."[190]  To determine whether a release was validly granted courts must apply "a totality of the circumstances test."[191]  The relevant factors include: (1) the "clarity and specificity" of the release; (2) the plaintiff's education and experience levels; (3) the amount of time the plaintiff had to think before signing; (4) whether the plaintiff "knew or should have known" of his or her rights before signing; (5) whether the plaintiff was

---

[189] All eligible non-union employees were offered a severance agreement. D.I. 4316-4 at 4 of 67.  The *Coughlen* plaintiffs acknowledge that the waivers are valid.  *Coughlen* Adversary, D.I. 54 at 9 n.9.

[190] *Cuchara v. Gai-Tronics Corp.*, 129 F. App'x. 728, 730 (3d Cir. 2005).

[191] *Id.* at 731.

advised by or actually received advice of counsel; (6) whether there was an opportunity to negotiate the agreement; and (7) whether the consideration given "exceed[ed] the benefits to which the employee was already entitled."[192]  It bears note that consideration is a necessary factor.  If there is no consideration then there is no bargained for exchange and, under basic contract principles, there is no legally enforceable obligation to uphold the bargain.

### A.    The first six factors, collectively, counsel in favor of enforcing the releases.

The first six factors, taken together, counsel generally in favor of enforcing the releases.  In substance, the record is that that the employees were provided with a release and informed that in order to be granted severance, they were required to execute and return the form of release.  The form of release is fairly straightforward.  And there is nothing in the record to suggest that any of the plaintiffs were tricked or coerced into signing and executing the release.   Accordingly, aside from the question whether there was sufficient consideration to support a contract (discussed below in Part III.B), there is no reason why the release should not be enforceable against those claimants who executed the release and received a severance payment.

- *Clarity and specificity.*  A release with a bolded title stating that it is a release and the traditional legalese of a waiver is generally considered "clear."[193]  Here, the title of the release is bolded and underlined and

---

[192] *Id.* at 731 (citing *Cirillo v. Arco Chem. Co.*, 862 F.2d 448, 451 (3d Cir. 1988)).

[193] *Geraghty v. Insurance Services Office, Inc.*, 369 F. App'x. 402, 406 (3d Cir. 2010).

clearly states that it is a "Release of Claims."[194]  The release then states

that "In exchange for the Severance payment I (the below undersigned)

agree to voluntarily and knowingly release the Company … from all

causes of action … that I ever had, now have, or hereafter may have."[195]

The notice goes on to list specific causes of action (including WARN Act

violations) which may be available and that are subject to the waiver.[196]

This kind of language is generally considered "clear" in the Third

Circuit.  For example, in *Geraghty v. Insurance Services Office*,[197] the

court held that a four-page release (this one is only a page and a half)

with substantially similar language constituted a clear release.[198]  And

there is nothing to warrant a deviation in this case.

- *Plaintiff's education and experience.*  A releasee must have enough
  education to comprehend the agreement adequately.  This is a low bar.[199]
  Generally, individuals with some relevant education and business
  experience satisfy this standard.[200]  Here, the *Moore* plaintiffs do not
  challenge that they were able to comprehend the release. [201]

---

[194] D.I. 2582-1.

[195] *Id.*

[196] *Id.*

[197] 369 F. App'x. 402.

[198] *Geraghty*, 369 F. App'x. at 406; *see also Oliver v. Wincor Nixdorf Corp.*, No. 12-2921, 2018 WL 515855, at *4-*5 (D. N.J. Jan. 23, 2018) (citing cases).

[199] *Oliver*, 2018 WL 515855, at *5.

[200] *Id.*

[201] *See generally Moore* Adversary, D.I. 102, D.I. 122.

- *Amount of time.* The amount of time made available before signing is a similarly low bar.   Courts generally view twenty-one days as an acceptable amount of time.[202]  Here, the *Moore* plaintiffs imply that the signatories were pressured into signing quickly because the waiver was already dated.   But there is no deadline in the waiver and there was nothing keeping employees from considering the notice for at least 21 days.

- *Whether plaintiffs "knew or should have known" of their rights.* Plaintiffs are on notice of their rights if the release specifically states the cause of action they are waiving or if employees are provided with an employee handbook informing them of their rights.[203]  Here, the release explicitly included waiver of "claims relating to failure to provide WARN notice" and includes a full citation to the statute.[204]  Accordingly, this factor counts favor of the waiver's enforceability.

- *Advice of counsel.*  Whether plaintiffs have time to seek legal counsel is secondary   to   the   "more   important   consideration   [of]   whether consultation with a lawyer was encouraged."[205]  Encouragement to seek legal counsel can be verbal or written.[206]  Here, there is no evidence that

---

[202] *Id.*; *Cuchara v. Gai-Tronics Corp.*, 129 F. App'x. 728, 731 (3d Cir. 2005).

[203] *See Cirillo*, 862 F.2d at 452; *Oliver*, 2018 WL 515855, at *5; *Garofola v. Vela Rsch.*, 2015 WL 3866238, at *7 (D. N.J. June 19, 2015).

[204] D.I. 2582-1.

[205] *Cirillo*, 862 F.2d at 454.

[206] *Id.*

Yellow advised affected employees to seek legal counsel.  Instead, the debtors point to the testimony of a single employee who sought legal advice.[207]  The fact that she had time to seek and receive legal counsel is certainly a point in favor, but there is no evidence that the debtors encouraged affected employees to seek legal counsel.  As such, this factor is neutral as to enforceability.

- *Opportunity to negotiate.*  The fact that a release is subject to negotiation suggests that the release was granted knowingly and voluntarily.[208]  Here, the release was clearly not negotiable.  The frequently asked questions page made available to employees explicitly states that "the Severance Agreement is non-negotiable."[209]   Accordingly, this factor counts against enforceability.

Considering these first six factors collectively, the Court is satisfied that the waivers here would be valid and enforceable so long as such enforcement was supported by ordinary principles of contract law.  But as described below, on the final factor – whether consideration was granted in exchange for the releases – the Court does not believe that the existing record supports entry of summary judgment for either party.

---

[207] *Moore* Adversary, D.I. 114 at 15.

[208] *Cirillo*, 862 F.2d at 454 n.4.

[209] *Moore* Adversary D.I. 43-1 at 2 of 2.

**B.     There is a genuine question of fact as to whether the debtors paid consideration in exchange for the release of claims.**

The *Moore* plaintiffs' strongest argument against the enforceability of the release arises out of the debtors' decision to pay severance to *all* of the non-union employees. The record about what exactly occurred is less than complete.

That record reveals the following. In her first declaration, Sarah Statlander, the debtors' vice president for human resources, explained that "[a]ll eligible non-union employees who were laid off on July 28, 2023 were offered a Notice of Separation & Release of Claims … in which they would be paid severance (calculated based on years of service and/or position) in exchange for a release of claims."[210] The form of severance agreement was attached to Statlander's declaration. That form provides for an express release of WARN Act claims.[211] Statlander explained that the form was available to be signed electronically by employees on the company's Oracle system.[212]

Statlander's second declaration repeats those points but adds that because "severance payments had to be paid before Yellow filed for bankruptcy and the timing of a filing was fluid, Yellow preemptively made severance payments to all eligible non-union employees who were laid off between July 28, 2023, and the Petition Date out of an abundance of caution."[213] She added, however, that the debtors "now have

---

[210] D.I. 2582 at 2.

[211] D.I. 2582-1.

[212] D.I. 2582 at 2-3.

[213] D.I. 4291-4 at 4 of 67.

the right to seek repayment of all severance payments made to employees who did not sign Severance Agreements."[214]  She attached as an exhibit a list of those non-union employees who signed the severance agreement providing releases.[215]

When asked about this issue at her deposition, Statlander's testimony was broadly consistent with her declaration.  She said that with respect to "the separations that occurred [on] July 28, we – again, given the time constraints we were working under, we paid severance regardless of whether or not the agreement was signed."[216]  She added, however (as her second declaration also notes), that "[a]fter the bankruptcy filing, we required signature to pay severance."[217]

The *Moore* plaintiffs' theory turns on the fact that those employees who were terminated before the bankruptcy and executed releases would have received severance payments whether or not they executed those releases.  For that reason, the *Moore* plaintiffs argue that employees who did execute the release received no separate consideration for doing so.  For that reason, they contend, the releases are invalid.

Indeed, the *Moore* plaintiffs' theory takes an almost conspiratorial turn, describing the company's statement that employees were required to sign the release to obtain the severance payment as a "clear falsehood," and that the releases are

---

[214] *Id.*

[215] D.I. 4291-4 at 17-67 of 67.

[216] *Moore* Adversary, D.I. 102-1 at 12 of 12.

[217] *Id.*

invalid because they were "procured through fraud."[218]  The *Moore* plaintiffs go on: "Debtors falsely told the terminated employees in writing that they would get the severance pay only if they signed.  But this was not true, as the Debtors knew. And there is no conceivable reason why anyone would have signed the release, except for reliance on that false statement."[219]

The parties do not dispute that if there was no consideration, the releases are invalid.[220]  Nor is there any disputing the general proposition of law that a release obtained by means of fraud is invalid.[221]  The question, therefore boils down to whether the debtors made a knowingly false statement when they represented to employees that they were required to sign the release in order to obtain the severance payment.

If the debtors' intent all along had been to make irrevocable payments regardless of whether the employee signed a release, then a case could be made that the release was fraudulently induced and/or that the employees received no separate consideration in exchange therefor.  On the other hand, one can also imagine more innocent explanations.  Perhaps the debtors' intent was to require a release at the time they made that statement to their employees, and only later decided to go ahead

---

[218] *Moore* Adversary, D.I. 102 at 3, 14.

[219] *Id.* at 14.

[220] *See Moore* Adversary, D.I. 114 at 14 (contending that the "consideration that Yellow provided in exchange for the Severance Agreements was valid, as it was more than Plaintiffs were entitled to by contract or law") (internal quotations and citation omitted).

[221] *See generally Restatement of Contracts* (Second) § 164(1) ("If a party's manifestation of assent is induced by either a fraudulent or a material misrepresentation by the other party upon which the recipient is justified in relying, the contract is voidable by the recipient.").

and make the payment just before the bankruptcy filing when they came to appreciate the complications associated with making post-petition payments on a prepetition promise. Alternatively, the debtors might have known at the time that they were going to make the payment to all employees, but remained open to the possibility that its bankruptcy estate might later seek to recover the payments from those who did not execute releases (on a theory such as unjust enrichment, fraudulent conveyance, or otherwise). In either of those cases, there was nothing at all fraudulent about what happened and the consideration – the making of a payment that could not be clawed back later – was valid consideration to support the release.

The legal principle underlying the *Moore* plaintiffs' theory is the notion that "past consideration" is insufficient to support the existence of a contract. The point is explained in *Williston on Contracts* as follows:

> The term "past consideration" or "executed consideration," though occasionally used by the courts, is self-contradictory. Consideration, by its very definition, must be given in exchange for a promise or, at a minimum, in reliance upon a promise. Accordingly, something that has been given before the promise was made and, therefore, was neither induced by the promise nor paid in exchange for it, cannot, properly speaking, be sufficient, valid, legal consideration.[222]

So, the *Moore* plaintiff's theory is that once the debtors had decided that they were going to pay severance whether or not the employees executed a waiver, the actual payment of that severance was no longer sufficient consideration to support a contract.

---

[222] 4 *Williston on Contracts* § 8:13 (4th ed. 2024) (footnotes omitted).

The Court is more than a little skeptical of the *Moore* plaintiffs' theory. Simply as a matter of common sense forged by ordinary experience, it seems far more likely that the debtors would have determined that in light of the complexities of having to obtain court approval to honor the prepetition contractual commitment to pay severance on a post-petition basis, it made more sense to go ahead and pay the severance in the hopes and expectation that most of the employees would execute releases. And to the extent that there were some who did not, the bankruptcy estate could come back another day to the question of whether it made sense to seek to claw those back. But because those who executed the release forms would not be subject to that risk, those claimants received valid consideration in exchange for the releases they executed.[223]

That said, the issue is now before the Court on summary judgment, a stage of the litigation in which one cannot assess the credibility of witnesses and in which all reasonable inferences must be drawn in favor of the non-moving party. And the Court cannot, without making a determination about credibility or drawing inferences against the *Moore* claimants, reject their claim that the debtors were simply lying when they told their non-union employees that they were required to sign the releases in order to obtain the severance payments. And in fairness, the record is very thin on the question of exactly why the debtors chose to proceed as they did. Nothing in the record indicates who the relevant decisionmaker was. Nor does the record contain

---

[223] 2 *Corbin on Contracts* § 5.14 (2023) (the type of "value" that counts as valid consideration is "always variable, always a matter on which opinions may differ, and frequently one that is very difficult to estimate").

a greater explanation for the reasons behind the decision than the conclusory statement in Statlander's declaration that the decision was driven by the pendency of the bankruptcy filing.  In the face of the existing summary judgment record, then, the Court concludes that both sides' summary judgment motions must be denied. Based on that record, this matter can only be decided after trial.

## IV.    There is a genuine question of material fact as to whether damages should be reduced on account of the debtors' good faith.

Section 2104(a)(4) of title 29 allows courts to, in their discretion, reduce a company's liability under the Act if the employer shows that the violative "act or omission" was "in good faith and that the employer had reasonable grounds for believing that the act or omission was not a violation" of the WARN Act.[224]  The exception is narrowly construed, and the employer bears the burden of proof.[225]  To satisfy its burden, the employer must present subjective evidence of its intent to comply with the Act and evidence of "objective reasonableness in the employer's application of the Act."[226]  The good faith exception is "intended for circumstances where the employer technically violates the law but shows that it did everything possible to ensure" that its employees received enough advance notice of the layoff.[227]

Showing subjective intent may be accomplished by including "proof that the employer worked with legal counsel to determine whether the company was in

---

[224] 29 U.S.C. § 2104(a)(4).

[225] *Castro v. Chicago Housing Auth.*, 360 F.3d 721, 730 (7th Cir. 2004).

[226] *Id.*; *In re Jamesway Corp.*, 235 B.R. at 345.

[227] *Chicago Housing Auth.*, 360 F. 3d at 731.

compliance with" the Act and more general evidence that the company "had its employees' welfare in mind."[228]

The plaintiffs argue that Yellow's good faith defense should fail because Yellow has not presented evidence demonstrating a thorough subjective intent to comply with the Act or that its compliance efforts were objectively reasonable.[229] They argue that the debtors did not have sufficient subjective intent to comply with the Act because they presented no evidence that the company considered issuing WARN notices when notice would have been required.[230] But because (as described above) the debtors' demise was not reasonably foreseeable 60 days in advance of the layoffs, asking whether the debtors considered issuing WARN Act notices when there was no reason to expect that they would have been required to do so is quite beside the point.

There is certainly evidence in the record showing that Yellow was concerned with meeting its obligations under the WARN Act. In previous instances in which it had conducted a mass lay off, the company had taken steps to issue WARN Act notices.[231] And the declarations from both Statlander and Hawkins make clear that the debtors intended that "WARN Notices went out to all of [the debtors'] affected employees."[232]

---

[228] *Frymire v. Ampex Corp.*, 61 F.3d 757, 768 (10th Cir. 1995); *In re Old Electralloy Corp.*, 162 B.R. 121, 126 (Bankr. W.D. Pa. 1993) (holding that the good faith exception applied because the debtor relied on advice of counsel when they decided to close the company).

[229] D.I. 4286 at 35-36.

[230] *Id.*

[231] *See*, *e.g.*, D.I. 4036-1 at 12 of 94.

[232] D.I. 2581 at 31.

The plaintiffs do not contest this evidence. They argue, however, that the debtors' actual compliance efforts were objectively unreasonable. They contend that the non-union separation notice was so defective that it could not be considered an objectively reasonable attempt to comply with the Act.[233] And in light of the debtors' blanket assertion of attorney-client privilege with respect to all communications with counsel, the debtors cannot now be heard to point to their reliance on advice of counsel in support of their good faith.[234]

But even without consideration of the reliance on the advice of counsel, based on the existing summary judgment record the case for reducing damages, under § 2104(a)(4), seems to be a fairly strong one. Recall that this is a case in which the Court has found, on the existing summary judgment record, that the debtors had two valid affirmative defenses to WARN Act liability. The debtors are nevertheless liable in damages because the notices they provided, which are required by statute, were inadequate. With respect to the non-union employees, those deficiencies were meaningful, though it is by no means obvious that an employee who received a compliant notice would be materially better off than those who received the debtors' inadequate ones. And with respect to the non-union employees, even the inadequacy of the notices is a very close question. On top of that, while the formal notices were indeed inadequate, much of the information that the company was supposed to have provided in the notices was in fact communicated to the employees in separate

---

[233] D.I. 113 at 17.

[234] D.I. 4722 (Oct. 28, 2024 Hr'g Tr. at 120:2-122:1).

correspondence.  And while that does not, as a technical matter, excuse the failure to provide an adequate notice, it is certainly powerful evidence in support of the company's good faith.

That said, in the Court's view, the application of this defense is more appropriate after trial than at summary judgment, as it calls for the exercise of discretion in light of a more complete universe of evidence than is available at this stage of the litigation.  But it is not too much to say that the Court views the debtors' violation of the WARN Act in this case to be something of a technical one.  And so, while the Court does not believe it appropriate to resolve this issue on the existing summary judgment record, the parties should appreciate that if the evidence at trial is broadly consistent with the existing record, there is a substantial prospect that the Court will exercise the discretion afforded to it by § 2104(a)(4).

## V. The Court will grant summary judgment in part, and deny it in part, with respect to the various state law claims.

The union plaintiffs argue that the debtors are also liable under the New York, New Jersey, and California state WARN Acts.[235]  The *Coughlen* plaintiffs also make an argument regarding back pay owed under the North Carolina Wage and Hour Act and the California Labor Code.[236]  The debtors assert that, to the extent they are

---

[235] D.I. 4286 at 36.  The *Moore* plaintiffs also suggest, in a footnote, that the releases are invalid under New Jersey state law.  *Moore* Adversary D.I. 102 at 11 n.7.  Courts typically do not engage substantive arguments that are presented only by way of a footnote.  *See, e.g., Taransky v. Sec'y of U.S. Dept. of Health and Hum. Servs.*, 760 F.3d 307, 320 n.12 (3d Cir. 2014).  Even so, the *Moore* plaintiffs' arguments are without merit because waivers of the New Jersey WARN Act are enforceable if approved by a court of competent jurisdiction, such as this one.  N.J. Stat. Ann. § 34:21-2(e).

[236] *Coughlen* Adversary, D.I. 50 at 29-30.

employers under the state-law versions of the WARN Act, they qualify for the same exceptions available to them under the federal WARN Act.[237]

*New Jersey WARN Act.*  The federal WARN Act and the New Jersey WARN Acts are similar, but the New Jersey law "differs slightly from its federal counterpart."[238]  The notice requirement under the New Jersey law explicitly relies on the federal definition, so it has been held to impose the same requirements.[239] Where the New Jersey law imposes separate requirements, however, it has been interpreted differently than its federal counterpart.[240]

Under the New Jersey Act, an "employer" is defined as "an individual or private business *entity* which employs the workforce at an establishment."[241]  An establishment is "a place of employment which has been operated by an employer for a period longer than three years" with certain exceptions.[242]

The definitional difference is slight, but meaningful.  A business *enterprise* is different from a business *entity*.  A business entity is generally understood as the legally recognized organization (i.e., partnership, corporation, LLC, etc.), whereas an

---

[237] D.I. 4452 at 59-60.

[238] *Del Rossi v. Forman Mills, Inc.*, No. 23-3136, 2024 WL 2130696, at *8 (D. N.J. May 13, 2024); *DeRosa v. Accredited Home Lenders, Inc.,* 22 A.3d 27, 36 (N.J. App. Div. 2011) ("[I]n the absence of case law interpreting the Act, we look to federal WARN Act regulations and case law for guidance in interpreting the New Jersey WARN Act.").

[239] 29 U.S.C. § 2101; N.J. Stat. Ann § 34:21-1; *see, e.g., In re Jevic Holding Corp.*, 787 F.3d 173, 176 (3d Cir. 2015).

[240] *Moss v. Retirement Value, LLC*, No. 12-157, 2013 WL 5816657 (D.N.J. Oct. 28, 2013) (recognizing the federal WARN Act required 100 or more employees but New Jersey law requires only 50).

[241] N.J. Stat. Ann. § 34:21-1 (emphasis added).

[242] *Id.*

*enterprise* requires some ongoing commercial activity.  The New Jersey Act therefore cannot fairly be read to support a liquidating fiduciary exception.  In the Third Circuit, the liquidating fiduciary exception grew out of the fact that a business *enterprise* must, by definition, be engaged in some commercial activity.  The notion of a business *entity*, however, need not.  As such, to give effect to the decisions of the New Jersey State Legislature, the Court finds that the debtors were an employer under New Jersey state law – even if it turns out that the debtors had completed their last delivery before terminating the union employees on July 30, 2023.

And, because the "unforeseeable business circumstance" and "faltering company" exceptions are not contemplated under New Jersey law, the *Coughlen* and union plaintiffs' motions for partial summary judgment will be granted regarding the applicability of New Jersey WARN Act.

*California WARN Act.*  Under the California WARN Act an employer that is planning to conduct a mass layoff must give at least 60 days' advance notice to "(1) employees of the covered establishment affected by the order. (2) The Employment Development Department, the local workforce investment board" and certain other government officials.[243]  The notice must satisfy the elements "required by the federal [WARN] Act."[244]

The California WARN Act's statutory exceptions also differ from its federal counterpart.  Unlike the federal WARN Act, the only exception provided under the

---

[243] Cal. Lab. Code § 1401(a)(1)-(2).

[244] *Id.* at (b).

California statute is the faltering company defense.[245]  Under California law, whether a company qualifies for the faltering company defense is adjudicated by California's Director of Industrial Relations.[246]  The debtors have represented that adjudication under this process is ongoing.[247]

The debtors argue that they are not employers under the California WARN Act because, they contend, the liquidating fiduciary exception applies.[248]  But neither the text of the California WARN Act nor applicable caselaw supports the existence of a liquidating fiduciary exception under California law.  Like the New Jersey WARN Act's employer definition, the California law's definition of "employer" is not limited to a business "enterprise."[249]  The Court will accordingly deny summary judgment on the liquidating fiduciary exception so the state adjudicative process as it relates to the state's faltering company exception can proceed.

*New York WARN Act.*  The New York WARN Act defines an employer as "any business enterprise" that employes 50 or more employees.[250]   Unlike the federal WARN Act, an employer that conducts a mass lay off must provide at least 90 days' notice.[251]   The New York Act provides for both the unforeseeable business

---

[245] *See generally* Cal. Lab. Law. § 1402.5.

[246] *Id.*

[247] D.I. 4291-1 at 24-25 of 38.  The parties have presumably concluded that proceeding before the California Department of Industrial Relations fit within the police or regulatory power exception to the automatic stay set forth in 11 U.S.C. § 362(b)(4).

[248] D.I. 4452 at 59.

[249] *See* Cal. Lab. Law. § 1401.

[250] N.Y. Lab. Code § 860-a(3).

[251] *Id.* at § 860-b(1).

circumstance and faltering company exceptions.[252]  Like the federal WARN Act, an

employer that seeks to take advantage of the statutory exceptions must provide "as

much notice as practicable" and must include a "brief statement of the basis for

reducing the notice period."[253]  The notice requirements of the New York Act are the

same as the federal notice requirements.[254]  Because the New York statute uses the

same language to define an employer as does the federal act, and the New York Act

similarly does not define a "business enterprise," there may well be a basis to apply

the liquidating fiduciary exception under New York law.  And at least one court has

done so.[255]

Because the New York statute (other than providing for a longer period) is

otherwise materially the same as the federal WARN Act, partial summary judgment

on the New York WARN Act claims will be granted in part and denied in part in the

same way in which the federal claims are.[256]

*North Carolina Wage and Hour Act and California Labor Code.*  The *Coughlen*

plaintiffs moved for summary judgment arguing that they were owed back pay under

the North Carolina Wage and Hour Act and California Labor Code.[257]  The debtors

---

[252] N.Y. Lab. Code § 860-c(1)(a)-(b).

[253] *Id.* § 860-c(2).

[254] *Id.* § 860-b(2).

[255] *See In re MF Global Holdings, Ltd.*, 481 B.R. 268, 283-284 (Bankr. S.D.N.Y. 2012).

[256] *See In re Dewey & LeBoeuf LLP*, 507 B.R. 522, 527-534 (Bankr. S.D.N.Y. 2014) (applying the same analysis to the federal and New York WARN acts).

[257] *Coughlen* Adversary, D.I. 50 at 29-30.

have not moved for summary judgement on this issue, so all inferences will be drawn in their favor.

The only evidence to which the *Coughlen* plaintiffs point is a spreadsheet that purports to calculate outstanding amounts owed to certain employees.[258] They claim that this spreadsheet sets forth overdue amounts owed to certain union members. The debtors argued, at the October 28, 2024, hearing, that the table actually shows the amounts that *were* paid to those employees, not the amounts that are due. The *Coughlen* plaintiffs did not describe in their papers, or at the hearing, the form and function of the spreadsheet. In light of the competing interpretations and limited guidance from the record, the Court cannot grant summary judgment based on the record before it. The motion will therefore be denied.[259]

## Conclusion

For the forgoing reasons the Court will grant summary judgment in part and deny it in part, as described above. The parties are directed to settle an order so providing.

Dated: December 19, 2024

_____
CRAIG T. GOLDBLATT
UNITED STATES BANKRUPTCY JUDGE

---

[258] *Id.* at 29-30 n. 30-31.

[259] In addition to the substantive WARN Act issues, the debtors devote essentially two paragraphs of their brief to claims asserted by certain pension funds. D.I. 4291 at 39-40. These contractual claims involve separate parties from the statutory claims that were the principal subject of the present motions. The Court understands that the parties have an understanding to engage those issues separately. The Court accordingly does not address them in this Memorandum Opinion.